JoNes, Chief Judge,
delivered the opinion of the court:
The issue in this case is whether plaintiff was permanently incapacitated for active military service at the time of his release to inactive duty by reason of a shell wound received in combat during World War II. A corollary to this question is whether the action of the Army Board for Correction of Military Records was arbitrary or capricious.
The facts are set forth clearly and in detail in the findings of the trial commissioner who heard the evidence in the case. These findings are adopted and made the findings of the court. They will be merely summarized here.
Plaintiff enlisted in the Army of the United States on March 7, 1941. He served as an enlisted man until October 17, 1941, and again from February 13, 1942, to January 28, *461 1944, at which time he was commissioned a second lieutenant in the Infantry as a leader of a rifle platoon handling rifles, machine guns and other infantry ordnance.
While engaged in assault upon the enemy in northern France, plaintiff was struck by an enemy shell fragment which entered his left shoulder, making an opening about two inches long where it entered and five inches long where it went out, fracturing the humerus. He fell, was unable to move, and remained in that position several hours until the enemy fire ceased in late afternoon when he was given a morphine injection and carried back to the American lines to a first aid station. The details and actions are set out in findings 4 and 5.
A simple reading of the findings of fact will convince any reasonable person that plaintiff was disabled for military duty at the time of his release to inactive duty. The undisputed facts show that he possessed to a marked degree courage and skill, qualities which are admired by free people everywhere.
After treatment at the first aid station, he was taken to the evacuation hospital at Nancy, France, where he was given a blood transfusion and his arm placed in a cast.
He was given hospital treatment and X-ray examinations, and then transferred to the United States, arriving at Baxter General Hospital at Spokane, Washington, in a body cast. He went before a Disposition Board at Baxter General Hospital in June 1945. This Board found his wounds severe with a complete compound fracture, but held that the disability was partial and temporary and that he should be classified as qualified for a limited-service status for six months. He was examined at several hospitals as set out in findings 8 and 9.
Plaintiff went before an Army Retiring Board at the Regional Station Hospital, Fort Ord, California, on January 81,1946. The left shoulder was found atrophied by Captain Aim, who testified that the plaintiff was qualified for and should be retained on limited service not to exceed six months and that the slight limitation of motion probably would not be permanent. Plaintiff stated that his arm was very sensitive to any bump, that it ached in cold or damp weather, *462 and that he could not sleep on his left side. He stated that since he was eligible for separation from the service he desired to be released from active duty. The Eetiring Board found that the plaintiff was not incapacitated for active service and recommended that he be placed on temporary limited service for six months, to be reexamined.
This finding was approved by the Surgeon General and Secretary of War. Plaintiff was again examined on March 8, 1946, and released from active duty on April 22,1946.
By letter dated March 14, 1946, plaintiff was advised by the Adjutant General that the War Department had approved the findings of the Eetiring Board. In the same letter plaintiff was authorized to report to an Army general hospital on or about August 28, 1946, for reexamination to determine his eligibility for retirement pay regardless of whether or not he was on active duty at that time.
On April 1, 1946, plaintiff assumed the duties as a mail clerk at a station of the Bremerton, Washington, Post Office. The station being small, the main duties of his work required, among other activities, that he lift and handle sacks of mail and parcel post packages. He experienced pain in the area of the injury to such an extent that he had to call upon his assistant mail clerk to do the heavy lifting. He continued to experience severe pain whenever that area was hit or bumped.
In the meantime, plaintiff was examined by a Dr. Thorson at Bremerton, Washington, who took N-ray pictures which showed a complete fracture of the left humerus, irregular and angular, rather than straight across the bone; that there had been some overlapping and the bone shortened. The picture showed an opening in the line of the union of the bone, indicating soft tissue at that point rather than solid bone. The injury was swollen and red. Dr. Thorson found osteomyelitis, atrophy of the muscle of the left shoulder and of the left chest, and some limitation of motion of the arm.
In August 1946, plaintiff reported to Madigan General Hospital at Fort Lewis, Washington, and was advised that he would be required to stay approximately one month for a period of tests, for assembly of his records, and for a hearing before the Evaluation Board. Because of pressing per *463 sonal problems, he stayed only one day and then left at his personal request.
Plaintiff was at first rated by the Veterans Administration 20 percent disabled, later increased to 30 percent, then to 50 percent, and finally to 100 percent, effective March 26,1952; and later reduced again to 40 percent, and finally to 30 percent, effective April 5,1957.
By letter dated May 11,1948, plaintiff requested authorization from the Surgeon General to report for a retirement board hearing at Madigan General Hospital, Fort Lewis, Washington. The various records were assembled, other tests made and plaintiff admitted to the hospital. He appeared before a Disposition Board which made the diagnosis set out in finding 19. The Board found that by that time the drainage had ceased; that there was not any gross shortening of the left upper extremity, and no great amount of atrophy; that there was some loss of muscle; that patient complained of tenderness in the area when any movement took place; and that he had a bursa overlying the end of the fragment. The Board found that plaintiff was not disabled for military service.
Plaintiff’s treatment and record at the Veterans Administration showed that as of April 28,1949, the fracture of the left humerus was healed, but that the scar was tender under pressure; that the shoulder was painful; that there was marked atrophy, disability of the left humerus in the socket, and tenderness over tuberosity; that X-ray pictures taken in April 1948 showed “chip fracture from tuberositie pulled to edge of acromion indicating injury to rotation cuff of shoulder.”
As shown in findings 22 and 23, the plaintiff was examined and treated by various doctors both in and out of the Veterans Administration.
On July 30, 1953, plaintiff filed his application with the Army Board for the Correction of Military Records, by which he requested that his records be changed to show his separation from active service “by reason of permanent incapacitating disabilities incurred in line of duty in combat” and that he be granted disability retirement benefits effective April 23,1946.
*464 The Correction Board asked the Madigan General Hospital for a physical evaluation. Plaintiff underwent physical examination at that hospital from June 2 to June 24,1954. A medical board, consisting of three medical officers, after considering the tests then made and the brief history of plaintiff’s case, summarized their findings which are set out in finding 24. The medical board found that plaintiff was partially and permanently disabled and was unfit for military service; that he became incapacitated for military duty on December 7, 1944, and recommended that he be assigned to no type of military service; that plaintiff’s condition had stabilized sufficiently to be permanently evaluated; and it was recommended that he appear before a Physical Evaluation Board.
He appeared before a Physical Evaluation Board on June 29,1954. That Board found that plaintiff’s disabilities originated on December 7,1944; that they were the proximate result of plaintiff’s military duties; that they were permanent ; and that the two conditions combined showed plaintiff was entitled to a rating of 40 percent disability. The Physical Evaluation Board recommended that the plaintiff be discharged from the service with a 40 percent disability rating. The Correction Board advised the Army Physical Review Council of the pendency of plaintiff’s application for correction of records and of the proceedings of the Physical Evaluation Board convened June 29, 1954, and requested the comment and opinion of the Review Council as to whether plaintiff had sufficient disability on April 22, 1946, to warrant his separation by reason of physical disability under the rules, laws, regulations, and policies in effect at that time. The Review Council responded in the affirmative to the query of the Correction Board, and recommended approval of the findings and recommendations of the Physical Evaluation Board.
The Correction Board, composed of a panel of five members, met on September 15, 1954. Plaintiff was not present but was represented by counsel furnished by the Disabled Officers Association. The Correction Board heard no additional testimony and considered no additional documents, but had. the complete records of the plaintiff and the records *465 of the Veterans Administration before it. The Correction Board, one member dissenting, declined to correct plaintiff’s military record.
Drs. Thorson, Eosendale and Gustafson testified as witnesses in the trial of this case before the trial commissioner. They had frequently examined and treated the plaintiff and each expressed the opinion that the plaintiff was permanently incapacitated at the time of his release from active duty on April 22, 1946. Two of them stated that in their opinion plaintiff had a latent or quiescent osteomyelitis in his left humerus at the time of his release from active service and that this condition developed and flared up thereafter. They both testified that it was the nature of this malady to be quiescent for substantial periods and then recur. They testified as to the atrophy of the plaintiff’s arm and shoulder, stating that there was about % to % inch difference in the girth of the left arm as compared to the right, and that there was some weakness of the deltoid muscle of the plaintiff’s left arm and shoulder.
The plaintiff’s case dragged along with numerous examinations, tentative determinations and postponements. The first -final determination as to plaintiff’s right to retirement was the adverse decision of the Board for the Correction of Military Eecords on September 17,1954.
It is difficult to understand, after a reading of the details disclosed by the history of plaintiff’s case, how a Board for the Correction of Military Eecords could possibly reach the conclusion that it has reached. There is no doubt whatever of the nature of the injury. There is no doubt of the pain and suffering of the plaintiff during the intervening years. There is no doubt of the courage of the plaintiff under battle conditions. In recognition of this fact he was awarded a Bronze Star medal by the War Department. The trial commissioner who saw the witnesses face-to-face and who examined the record in this case has found that plaintiff suffered atrophy to the left deltoid and pectoralis muscles of his left arm and shoulder, resulting from service-connected injury, which permanently incapacitated him for general military duty as of the date of his release from active duty on April 22, 1946, and that the findings and conclu *466 sions of the Correction Board to the contrary were arbitrary and unreasonable.
The court finds that plaintiff was permanently disabled from military service from the date of his separation on April 22, 1946. Plaintiff is therefore entitled to disability retirement pay from April 22,1946, and judgment is entered to that effect, with the amount of recovery to be determined pursuant to Buie 38 (o).
It is so ordered.
Littleton, Judge (Bet.)/ Laramiore, Judge, and Whitaker, Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Boald A. Hogenson, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff is a citizen of the United States and a resident of Bremerton, Washington.
2. Born February 4, 1913, plaintiff served as an enlisted man in the Army of the United States from March 7,1941, to October 17,1941, and from February 13,1942, to January 28, 1944. On the latter date, he was commissioned a second lieutenant, Infantry, Army of the United States, and promoted to first lieutenant on December 1,1944. He served on active duty as an Infantry officer from January 28,1944, to April 22,1946.
3. Plaintiff received training at Fort Benning, Georgia, as an Infantry officer in the handling of rifles, machine guns and other Infantry ordnance. On October 6, 1944, he was sent overseas as a rifle platoon leader, arrived in France at a staging area about two weeks later, and reached the front lines in northern France on November 1, 1944.
4. On December 7, 1944, in the vicinity of Lemberg, in Alsace-Lorraine, the Army regiment of which plaintiff was a member was attempting to break through to Lemberg, and was being held up by German forces in trenches about 300 or 400 yards in front. An attack on the enemy position on the previous day had been driven back by artillery, machine gun, and rifle fire, and on the renewed attack at *467 about 10:00 a.m. on December 7, plaintiff’s platoon was in the lead. Plaintiff led his platoon across the brow of a hill about 50 yards from the enemy position, and then moved forward in advance of his men to provide rifle fire protection for individual members of his platoon to rush across an open area. As he subsequently attempted to reorganize his force the enemy subjected the area to intense artillery, mortar, machine gun, and small arms fire, and plaintiff was struck by a shell fragment, but refused evacuation until the platoon had safely withdrawn from its untenable position. In recognition of plaintiff’s action, the War Department awarded him a Bronze Star.
5. The shell fragment entered the back of plaintiff’s left shoulder making an aperture 2 inches long, fractured the humerus of the left arm and then left the arm making an aperture about 5 inches long. Plaintiff was caused to fall and roll over onto his back and was unable to move. He remained in that position for several hours until the enemy artillery fire ceased in late afternoon, when he was rescued, given a morphine injection, and carried back to the American lines to an aid station. There the wound was examined and dressed, and the injured arm was tied to plaintiff’s body to prevent movement. Plaintiff was then transported by ambulance to a tent hospital from which he was taken to the Army’s 117th Evacuation Hospital, Nancy, France, arriving there at 10:00 p.m. on the day the injury was incurred. Here he was given a blood transfusion, his wound was debrided, an X-ray examination was conducted, the arm was set, and a body cast applied from shoulders to hips.
On December 11, 1944, plaintiff was transported by train to the Army’s 40th General 'Hospital at Paris, France. Here the original cast was removed on December 13, a secondary closure of the wound was performed, and a new cast applied. On December 28, he was ordered evacuated to the United Kingdom.
On January 1, 1945, plaintiff was received at the Army’s 279th Station Hospital in Wales, where he remained until February 3, 1945. Shortly after his arrival the second cast was removed, and a hanging weight cast was applied, and *468 thereafter on. January 11, 1945, a body cast was again applied. On January 12, 1945, a Disposition Board found plaintiff was unfit for further duty in the European Theatre and recommended that he be transferred to the United States for further hospitalization and treatment. Upon arrival in the United States, plaintiff was held at Halloran General Hospital on Staten Island for a week and then transferred to Baxter General Hospital at Spokane, Washington.
6. Plaintiff was admitted to Baxter General Hospital on March 3, 1945, and remained there until late June 1945. Plaintiff had arrived at Baxter in a body cast. Shortly thereafter X-ray examinations were conducted which revealed evidence of delayed union of the fracture of the humerus: Plaintiff’s arm was then treated in a hanging cast until May 1945, during which time healing of the fracture progressed steadily. During the last half of May and until late June 1945, plaintiff’s arm was treated without immobilization. From December 1944 until mid-May 1945, plaintiff’s arm had been in casts.
7. On June 27, 1945, a Disposition Board at Baxter General Hospital, consisting of three officers of the Medical Corps, found that plaintiff had become unfit for military duty on December 7,1944, by reason of:
1. wound, shell fragment, upper third, left arm, severe, wounded in action against the enemy in France 7 Dec 44. Healed.
2. eracture, compound, complete, upper third, left humerus, incurred as in Dg 1. Healed. LD 1 and 2: Yes.
The Board further found that plaintiff had a partial and temporary disability for military service, concluded that the defect was not permanently incapacitating for general service, and recommended as follows:
1st Lt charles w. allin, formerly classified as qualified for full military duty, be returned to duty in a temporary limited service status for a period of six months, at the expiration of which period he will be returned to an appropriate medical facility for reconsideration of his physical capacity for military duty.
8. From Baxter General Hospital plaintiff was sent to Camp Roberts, California, where he was assigned to and *469 performed limited duty, which was the administrative work as executive officer of a rifle training company. He performed no duties requiring physical activity or exercise more than necessary for normal office work. This was the type of duty which plaintiff thereafter performed in the service until his release in April 1946.
On October 10, 1945, plaintiff underwent physical examination by the examining medical officer at Camp Boberts, and the report recommended that plaintiff be assigned to limited duty with troops, but that he should not perform duties involving sustained physical effort, nor sleep on the ground. This medical officer recommended that plaintiff “be excused from calisthenics, hand to hand combat, and use of upper extremities to any marked degree.”
9. On December 10, 1945, plaintiff was admitted to the Begional Station Hospital, Fort Ord, California, for appearance before a Disposition Board to determine his physical capacity for military service. On December 28, 1945, a Disposition Board, consisting of three medical officers, diagnosed plaintiff’s condition as follows:
(1) Atrophy, musculature, left shoulder girdle, mild, secondary to wound, penetrating, shrapnel, left arm, and fracture, compound, complete, upper third, left humerus, incurred due to enemy action 7 December 1944, France. (Unchanged).
This Board likewise found that plaintiff had a partial and temporary disability for military service, and recommended that:
1st Lt. Charles W. Allin, Infantry, formerly classified as qualified for temporary limited service, be retained on temporary limited service; however, in accordance with the provisions of Section V, Par 6 d, WD Circular 313, dated 12 October 1945, the Board recommends that he be ordered to appear before an Army Betiring Board.
At the time of his appearance before this Board, plaintiff complained of loss of strength in the affected arm, which complaint was noted by the Board. The Board’s record of proceedings contained further statements, as follows:
Examination at this Hospital including Laboratory Studies: There is a healed longitudinal scar approximately seven inches long on the anterior aspect of the *470 left upper arm. There is mild atrophy of the musculature of the left shoulder girdle. Motions of. the shoulder girdle and elbow joint are free in all directions. The grip is good, and there is no evidence of peripheral nerve involvement. X-ray examination reveals an old spiral fracture of the shaft of the. left humerus with abundant callus formation. There is no evidence of dislocation, osteomyelitis, or retained foreign bodies. The Orthopedic Consultant is of the opinion that there is a mild residual disability and that no treatment is indicated. The Consultant makes a diagnosis of atrophy, musculature, left shoulder girdle, mild, and recommends that he be placed on six months’ temporary limited service; however, in accordance with the provisions of Section V, Par 6 d, WD Circular 313, dated 12 October 1945, the Board recommends that this patient be ordered to appear before an Army Retiring Board. Course in Hospital: During hospitalization, no active treatment was required.
10. The Army Retiring Board convened at the Regional Station Hospital, Ford Ord, California, on January 31,1946, to hear plaintiff’s case, with plaintiff attending in person and waiving representation by counsel. Two medical witnesses, Captain Theodore E. Aim, M.C., and Captain Isi-dore Stein, M.C., testified.
Captain Ahn testified that he had made a physical examination of plaintiff, that plaintiff was incapacitated for active service, that the incapacity was not believed to be permanent, and that the cause of the incapacity was:
Atrophy, musculature, left shoulder girdle, mild, secondary to wound, penetrating, shrapnel, left arm, and fracture, compound, complete, upper third, left humerus, incurred due to enemy action 7 December 1944, France. (Unchanged).
Captain Aim also stated that plaintiff was qualified for and should be retained on temporary limited service for a period not to exceed six months, that his recommendation that plaintiff be retained for limited service only was based on the atrophy and on slight limitation of motion, that the condition was not permanent and would respond to treatment in about six months, but that further treatment at the hospital was not indicated.
*471 Captain Stein testified only tliat be was in full agreement witb tbe testimony of Captain Aim and had no additional testimony to offer.
Plaintiff testified that be believed be bad full use of bis left arm, but that it was weak and pained him once in a while, and that be didn’t think his arm would improve in six months. He further stated that his arm was very sensitive to any bump, that it ached in cold or damp weather, and that he couldn’t sleep on his left side. He stated that there had been some improvement since the last cast was removed in May 1945. He also advised the Board that he was eligible for separation from the service and that he desired to be released from active duty. In answer to a question as to whether he desired to remain on active duty in a limited service status if the Board found him not qualified for general service plaintiff replied in the negative.
11. The Army Eetiring Board found that plaintiff was not incapacitated for active service, and recommended that he be placed on temporary limited service for a period not to exceed six months, to be reexamined and reevaluated to determine his physical fitness for military service at the expiration of that period.
The finding and recommendation of this Board were approved by the Surgeon General and by the Secretary of War.
12. On March 8,1946, plaintiff underwent a terminal physical examination at Fort Lewis, Washington. It was noted in the report thereof that plaintiff’s arm was injured in action in France in December 1944, that there was a 7-inch scar on the left upper arm and a 114-inch scar on the back of the left shoulder, and that there was a slight weakness of the left shoulder but no limitation of motion.
By Special Orders 68, issued by Headquarters, Separation Center, Fort Lewis, Washington, dated March 9,1946, plaintiff was placed on terminal leave on March 9, 1946, and released from active duty on April 22,1946.
13. By letter dated March 14, 1946, plaintiff was advised by the Adjutant General that the findings of the Army Ee-tiring Board in his case had been approved by the War Department, and by this letter plaintiff was authorized to *472 report to an Army General Hospital on or about August 28, 1946, for reexamination to determine bis eligibilty for retirement pay benefits regardless of whether or not he was on active duty at that time.
14. Prior to and during the intervening period between his two periods of active military service, plaintiff was employed at the United States Post Office at Bremerton, Washington, as a mail clerk. During his military service, plaintiff had acquired additional seniority status, and the postal authorities at Bremerton had advised plaintiff prior to the Army Retiring Board hearing that they were holding a position open for him as supervisor of a classified station or branch of the main post office, and they indicated their desire that he fill the position as soon as possible. Plaintiff sought and obtained release from active duty because of this circumstance and also because of family considerations.
On April 1, 1946, plaintiff assumed the duties as supervisor of and mail clerk at a small station of the Bremerton Post Office. He was still on terminal leave from his active military duty. Because the station was small, the main duties of his work were those of a mail clerk, which required among other activities that he lift and handle sacks of mail and parcel post packages. When plaintiff attempted to use his left arm in lifting heavy mail, he experienced pain in the area of the injury to the extent that he had to call upon his assistant mail clerk to do the heavy lifting. Plaintiff continued to experience severe pain whenever the area of the injury was hit or bumped.
15. On May 24, 1946, which was slightly more than one month after the effective date of his release from active duty, plaintiff consulted a private physician, Dr. Orin P. Thorson, at Bremerton, Washington, advised how the injury had occurred, and complained of severe pain in his upper left arm. Dr. Thorson took X-ray pictures at that time which showed that there had been a complete fracture of the left humerus, that the line of fracture had been irregular and angular rather than straight across the bone, and that in the union of the bone there had been some overlapping to the extent that the bone was somewhat shortened. The X-ray pictures likewise showed that there was a small fenestration or open *473 ing in the line of the union of the bone, indicating soft tissue at that point rather than solid bone.
On May 25, 1946, Dr. Thorson gave plaintiff a heat treatment and an intravenous injection. At that time there was no apparent abscess or drainage from the injury, but there was pain on palpation.
On July 13, 1946, plaintiff again consulted Dr. Thorson. At that time, the area over the injury was swollen and red. Dr. Thorson injected a local anesthestic, made an incision into the area, extracted pus and a few fragments of bone, and provided a drain. On four different days from July 15 to 23, 1946, plaintiff’s arm was inspected by Dr. Thorson, on the last day of which period the drainage was more or less completed. On each of nine days between August 5 and 26,1946, Dr. Thorson gave plaintiff an injection of penicillin. August 26, 1946, was the last time that Dr. Thorson treated or examined plaintiff.
Dr. Thorson’s diagnosis of plaintiff’s condition was that he had osteomyelitis, a bacterial infection of the marrow or medullary portion of the left humerus, resulting from the penetration of the shell fragment through the arm with fracture of the bone. Dr. Thorson also found and concluded that there was atrophy of the deltoid muscle of the left shoulder and of the pectoralis muscle on the left side of the chest, both connecting with the left arm, and that there was some limitation of motion of the arm. His opinion was that the atrophy of the muscles was due to lack of use and also to permanent damage to nerves and other tissues resulting from the pentration of the shell fragment.
16. In August 1946, plaintiff reported to Madigan General Hospital at Fort Lewis, Washington, where he was advised that he would be required to stay approximately one month for a period of tests, for assembly of his records, and for a hearing before an Evaluation Board. Because of pressing personal problems, he stayed only one day, and then was released at his request.
17. On April 25, 1946, plaintiff was rated by the Veterans Administration 20 percent disabled, effective April 23, 1946, on account of the scars and other residuals from the injury to his left arm, the category of rating by the board being set forth in its report as follows:
*474 3165 Group III Scars, Shell Fragment, Penetrating, Left upper arm, with res.
Ever since April 23, 1946, plaintiff has received disability-compensation from the Veterans Administration on account of his arm injury.
Effective April 26, 1948, plaintiff’s disability rating was increased by the Veterans Administration to 30 percent; increased to 50 percent effective March 5, 1952; further increased to 100 percent effective March 26, 1952; decreased to 40 percent effective April 5, 1952; and established at 30 percent effective April 5,1957.
18. In the period of time from April 26, 1948, to March 4, 1952, plaintiff’s 30 percent disability rating by the Veterans Administration was based on its Diagnostic Code No. 5303 for residuals of gunshot wound, left shoulder, fracture of left humerus, with damage to and loss of some function of pectoralis and deltoid muscles.
19. By letter dated May 11, 1948, plaintiff requested authorization from the Surgeon General to report for a retirement board hearing at Madigan General Hospital, Fort Lewis, Washington. By letter dated June 29,1948, the Secretary of the Army authorized plaintiff’s admission to this hospital for physical evaluation, including appearance before a Disposition Board and, if warranted, an Army Be-tiring Board. After plaintiff’s records had been assembled and other necessary tests and arrangements had been made, plaintiff was on October 22, 1948, admitted to this hospital and appeared before a Disposition Board which made the following diagnoses of plaintiff’s condition:
1. 23021 — 416.6. Malunion of fracture, compound, upper third, left humerus, characterized by mild external rotation of distal fragment on proximal fragment, due when wounded in action, Alsace-Lorraine on 7 Dec 44, due to HE shell fragment. LD: Yes.
2. 242 — x 40 Peri articular fibrositis, left shoulder joint, mild, characterized by heterotopic calcification in soft tissues, mild, secondary to immobilization required in the treatment of diag #1. LD: Yes.
Plaintiff’s clinical record prepared at this hospital stated in part as follows:
*475 At this time he has no drainage from his arm, but states that in May 46, approximately 2y2 years ago, following local abscessing, a civilian M.D. lanced his arm, following which it drained for two or three weeks. This is the last report of drainage. The patient now complains of dull, aching pain in his left shoulder following prolonged use of the aim and also complains of tenderness and pain related to the old fracture site at the upper third of the left humerus. No specific exercises are attributed to this difficulty, but rather anything that involves prolonged use of the extremity.
Physical examination shows a 35 year old white male, 5'8" in height, and weighing 170 lbs. The examination is confined to the left and right upper extremities. There is no gross shortening of the left upper extremity and compared with the right member and there is no significant atrophy. Measurements of the left arm and left forearm show approximately %" to Yq" less girth measurement than the normal extremity, but patient is right-handed. There is no local redness nor heat nor axillary adenopathy noted at this time. There is no drainage from the arm. There is a 1 y2" scar on the posterior aspect of the left shoulder, representing point of entry of the missile and there is a 4y2" curvalinear scar on the anterolateral aspect of the upper and middle third, left arm, representing point of exit and also debridement wound. There is some loss of muscle (brachialis) below the deltoid insertion on the anterolateral aspect of the middle third of the left arm and through this minor defect can be palpated a slightly protruding portion of the proximal fragment. The patient complains of tenderness when this area is palpated and it is probable that he has a bursa overlying the end of this proximal fragment. There is no area of hypesthesia or anesthesia anywhere on the left upper extremity and there is no evidence of motor nerve involvement of any portion of the entire left upper extremity. Comparison of strength of the two arms shows that the left compares favorably in all modalities tested with the opposite member, considering that the left arm is the patient’s minor arm. Motions at the shoulder are essentially normal as regards abduction, flexion, extension, external and internal rotation, except that extremes require some forcing. Motions of the left elbow are normal in every manner. Strength of the muscles about the left shoulder and left arm are normal when tested individually. Overall strength of the left upper extremity against resistance compares favorably with the opposite arm. X-rays of the shoul *476 der joint is negative for bone and joint pathology as seen on the stereo-film studies. There is some hetero-topic calcification of mild degree in the soft tissues beneath the inferior rim of the glenoid and again above the rotator cuff on the greater tuberosity of the humerus, corresponding roughly to the region of the su-praspinatus tendon. The fracture is at the upper third of the humerus with an oblique fracture line. The fracture is soundly united but with a small fenestra through the central portion. There is a slight malunion characterized by mild external rotation of the distal fragment on the proximal fragment.
This Disposition Board found that plaintiff had no disability for military service and recommended that he was qualified for general military service. No hearing before an Army Retiring Board was arranged.
20. Plaintiff’s treatment and progress record at the Veterans Administration showed that as of April 28, 1949, his compound fracture of the left humerus was well healed, but that the scar was moderately tender under pressure. It was noted that the chief disability was with respect to the shoulder, which was painful on abduction. It was stated that there was marked atrophy, disability of the left humerus in the socket, and tenderness over tuberosity, and further that X-ray pictures taken in April 1948 showed “chip fracture from tuberositie pulled to edge of acromion indicating injury to rotation cuff of shoulder.”
Pursuant to records confirmed by the Veterans Administration, it is shown that plaintiff consulted Dr. H. A. Barner, Bremerton, Washington, on October 4,1949, concerning pain in his upper left arm. The area of the injury was then reddened, raised and swollen. Dr. Barner gave plaintiff a series of daily penicillin injections. By letter dated October 25, 1949, he advised the Veterans Administration at Seattle, Washington, that the pencillin treatments had resulted in localization of the infection and formation of an abscess, and that the abscess had drained out, but there was slight residual drainage. Dr. Barner further advised that there was pain on palpation and also on motion of the arm, and recommended that “X-rays be done to exclude sequestrum formation.” Dr. Barner continued his treatment of plaintiff’s arm through December 1949.
*477 21. At a time when plaintiff’s Veterans Administration disability rating was 30 percent, plaintiff was admitted to and treated at the T7.S. Naval Hospital, Bremerton, Washington, from January 23, 1950, to February 2, 1950, for a draining sinus of his upper left arm due to the fracture of the left humerus. This condition was osteomyelitis. Plaintiff was treated and the discharge ceased. The rating board of the Veterans Administration on April 3, 1950, considered this development, and decided that no change in the existing rating was warranted.
22. During the period from March 9, 1950, to October 16, 1951, plaintiff was treated on several occasions for the condition of his upper left arm by Dr. Frank Eosendale at Bremerton, Washington. In addition to injection of antibiotics, the treatments consisted of opening up and providing drainage from a recurring abcess of the area of the injury. Dr. Eosendale concluded that plaintiff had osteomyelitis in his left humerus, and advised plaintiff to seek definitive diagnosis and treatment from the Veterans Administration.
23. Pursuant to Dr. Eosendale’s advice, plaintiff sought assistance from the Veterans Administration in the latter part of 1951, and on March 12, 1952, an operation was performed on his left arm at the Veterans Administration Hospital, Seattle, Washington. Dr. I. J. Gustafson participated in this operation and provided preoperative and postoperative treatments. The hospital clinical record prepared by him under date of April 4, 1952, stated in part as follows:
Oowrse in the Hospital: On March 12th under general anesthetic this sinus tract over the left humerus was excised and was found to go all the way into the medul-lary cavity of the left humerus. Sclerotic bone surrounding the area was carefully curetted out as much as possible. Polyethylene tube was placed in the area following surgery and irrigated for five days after surgery with streptomycin. Postoperative course was uneventful. Patient was placed on leave of absence March 19, 1952 to return on March 28, 1952 for removal of the stitches and change of dressing. Pt was sent on LOA for another week and returned on April 4, 1952. Upon examination the wound was found to be well healed. Pt is asymptomatic, his WBC on 3/28/52 revealed 6,400 cells and a sed rate of 16 mm/hr. It is recommended that this pt be discharged MHB to return to the hospital *478 in 3 months as an NBO for recheck xrays of his left humerus.
fiNal diagnosis: Chronic osteomyelitis of the left humerus. Treated, improved.
Dr. Gustafson also noted in the clinical report that there was some atrophy of the left biceps and deltoid, and that X-ray pictures showed healed fracture of the left humerus with some deformity and overriding. Dr. Gustafson testified before this Court on August 4, 1958, that at the time of the operation in 1952 plaintiff’s osteomyelitis in the left humerus was deep-seated and chronic, that X-ray pictures taken August 4, 1958, indicated no infectious activity or residual osteomyelitis, that there was a chance even at that late date that the osteomyelitis would recur, but that recurrence becomes less likely as the years progress, and that it was reasonable for the Veterans Administration to conclude that by April 1957, a lapse of five years without recurrence, plaintiff’s osteomyelitis would be healed.
The Veterans Administration in May 1952 allowed plaintiff increased disability ratings during the period of hospitalization from March 5 to April 4, 1952, and provided for a 40 percent rating effective April 5, 1952, and for a 30 percent rating after 5 years of inactive osteomyelitis. Following the operation in March 1952, plaintiff returned to the Veterans Administration hospital for 4 or 5 visits during the balance of 1952 and in early 1953. Since that time, plaintiff has not been examined by the Veterans Administration.
24. On or about July 30, 1953, plaintiff filed his application with the Army Board for the Correction of Military Records, by which he requested that his records be changed to show his separation from active service “by reason of permanent incapacitating disabilities incurred in line of duty in combat” and that he be granted disability retirement benefits effective April 23,1946.
On June 2,1954, plaintiff was admitted to- Madigan General Hospital for physical evaluation at the request of the Correction Board for an advisory opinion in connection with plaintiff’s application. Plaintiff underwent physical examination and tests at this hospital until June 24, 1954, when a board consisting of three medical officers met and con *479 sidered plaintiff’s case. In addition to a brief history of plaintiff’s case, the written summary before this board stated in pertinent part as follows:
physical EXAMINATION on admission was essentially negative except for the left arm and shoulder girdle. Findings in this region were as follows: There was. an elliptical well-healed scar in the upper arm extending into the shoulder. There was a small posterior scar over the shoulder and a moderate amount of absence of atrophy of the anterior segment of the left deltoideus muscle. There was some weakness of abduction, elevation and flexion of the left shoulder joint. Range of motion was normal in all joints of the left upper extremity. There were no neurological findings in the left upper extremity except for slight hypesthesia of the upper end of the major scar.
laboratory : Urinalysis and hematology were within normal limits. Serology negative.
x-rays : 4 Jun 54: leet eorearm & elbow : Negative. leet humerus : There is evidence of an old well-healed fracture involving the upper third of the humerus below the surgical neck and no evidence of active osteo-myelitis at this time. There is evidence of calcification of the soft tissues just lateral to the acromion. 10 Jun 54: chest: Heart, lungs and bony thorax are normal.
hospital course: Clearances for the board were obtained and a muscle nerve test was done by the Physical Medicine Department. Their evaluation revealed normal range of motion and some weakness of the pectoral muscles and the anterior portion of the deltoideus in the left shoulder. It is the opinion of the service that this patient’s disability is restricted to his left shoulder and humerus. It consists of a moderate amount of weakness in the above described muscles plus a chronic osteomyelitis of the left humerous, at present inactive. He is to be presented to a Medical Board for evaluation.
The following diagnoses were made by this board:
1. Atrophy, due to disuse, anterior segment, deltoideus muscle, left, moderate. Equivalent to VA Code #5303 — Group III — Intrinsic muscles of shoulder girdle, moderate, left. LCD: Yes
2. Atrophy, due to disuse, pectoralis major muscle, left, mild. Equivalent to YA Code #5302 — Group II — Extrinsic muscles of shoulder girdle, slight, which *480 is not ratable. LOD: Yes
3. Osteomyelitis, chronic, upper third, left humerus, organism undetermined, traumatic, inactive for two years. Equivalent to YA Code #5000 — Osteomyelitis, chronic, inactive for two years. LOD: Yes
This Board found that plaintiff was partially and permanently disabled and was unfit for military service, that he became incapacitated for military duty on December 7, 1944, and recommended that he be assigned no type of military service. This Board further found that plaintiff’s condition had stabilized sufficiently to be permanently evaluated, and recommended that he appear before a Physical Evaluation Board.
25. On June 29,1954, plaintiff appeared before a Physical Evaluation Board at Madigan General Hospital, Fort Lewis, Washington. This Board reviewed plaintiff’s previous Board proceedings, his Adjutant General file, the clinical record of his current hospitalization, and the attendant Medical Board proceedings, and found plaintiff to be physically unfit for further military service due to the following diagnoses:
1. Atrophy, due to disuse, anterior segment, del-toideus muscle, left, moderate.
2. Osteomyelitis, chronic, upper third, left humerus, organism undetermined, traumatic, inactive for two years, moderate.
This Board found that plaintiff’s disabilities originated on December 7, 1944, that they were the proximate result of the performance of his military duty, that they were permanent, and that plaintiff’s atrophy under VA Code #5303 was 20 percent disabling and his chronic osteomyelitis, inactive, under YA Code #5000 was 20 percent, a combined rating of 40 percent. This Board recommended that plaintiff be discharged from the service with a 40 percent disability rating.
26. By formal request dated July 22, 1954, the Correction Board advised the Army Physical Eeview Council of the pendency of plaintiff’s application for correction of records and of the proceedings of the Physical Evaluation Board convened June 29, 1954, and requested the comment and opinion of the Eeview Council as to whether plaintiff *481 had sufficient disability on April 22, 1946, to warrant Ms separation by reason of physical disability under the rules, laws, regulations and policies in effect at that time.
By formal communication dated July 30,1954, the Review Council responded in the affirmative to the query of the Correction Board, and recommended approval of the findings and recommendations of the Physical Evaluation Board.
27. On September 15, 1954, the Correction Board, composed of a panel of five members, convened to hear plaintiff’s case. Plaintiff was not present in person but was represented by counsel furnished by the Disabled Officers Association. The Board had before it the complete military records of the plaintiff, records of the Veterans Administration, and also a summary prepared by the examiner for the Board. No additional documents and no testimony were presented, and the transcript of the hearing in the main consists of an oral presentation of plaintiff’s case by his counsel, with comments interposed by the chairman and examiner of the Board.
Under date of September 17, 1954, the Correction Board, with one member dissenting, adopted its findings, conclusions, and recommendations. The Board’s findings contained summaries of the facts and circumstances of plaintiff’s injury; diagnosis at Baxter General Hospital; the Disposition Board proceedings of June 27, 1945; the Disposition Board proceedings of December 28,1945; the Army Retiring Board proceedings of January 31, 1946; the terminal physical examination of March 8, 1946; the Disposition Board proceedings of October 22, 1948; the Medical Board proceedings at Madigan General Hospital on June 24,1954; the Physical Evaluation Board proceedings of June 29,1954; the recommendation of the Army Physical Review Council on July 30, 1954; the operation performed on plaintiff’s left arm on March 5, 1952; and the effective dates of the various Veterans Administration disability ratings for plaintiff.
The conclusions and recommendation of the Correction Board were as follows:
THE BOARD CONCLUDES :
1. That it concurs in the findings of the Army Retiring Board, convened 31 January 1946, and the Dis *482 position Board, convened 22 October _ 1948, that the applicant was not permanently incapacitated for active service.
2. That the applicant was physically fit to perform the duties of his office, rank or grade on 22 April 1946, the date of his separation from active service.
3. That the applicant’s separation from active service on 22 April 1946, not by reason of physical disability was not in error nor unjust.
THE BOARD RECOMMENDS ¡
That in the case of charles w. allin, his application for correction of military records, dated 28 July 1953, be denied.
Mr. Henson dissents without written opinion from the conclusions and recommendation, and recommends that applicant’s request be approved.
28. On October 11, 1954, the Secretary of the Army approved the findings, conclusions, and recommendations of the Correction Board in plaintiff’s case, and denied plaintiff’s application for correction of military records.
On February 11, 1955, plaintiff requested reconsideration of his case by the Correction Board. Submitted with his written request was an affidavit of Dr. Thorson concerning his treatment in 1946 of the abscess to plaintiff’s arm and his conclusion that the abscess was due to osteomyelitis of the left humerus resulting from the injury; an affidavit of Dr. Barner that plaintiff was treated by him from October 4, 1949, through December 1949, during which time he received penicillin and dressings for infection of the left humerus; an affidavit of Dr. Rosendale that from March 9, 1950, to October 16, 1951, he treated plaintiff for draining sinus of the left upper arm due to the service-connected injury, that his treatment consisted of lancing and injections of penicillin as necessary; affidavits of the Postmaster and a fellow mail clerk at the Bremerton Post Office concerning difficulties experienced by plaintiff in lifting packages and heavy mail; and an affidavit of a fellow Army officer concerning the nature of the limited service duty of plaintiff at Camp Roberts, California, in October and November 1945.
On February 26, 1955, plaintiff’s request for reconsideration was denied by the Correction Board.
*483 29. Dr. Tborson, Dr. Rosendale, and Dr. Gustafson testified as witnesses for the plaintiff in the trial of this case before this Court, and each expressed the opinion that plaintiff was permanently incapacitated for military duty at the time of his release from active duty in April 1946.
Both Dr. Thorson and Dr. Rosendale stated their opinion to be that plaintiff had a latent or quiescent osteomyelitis in his left humerus at the time of his release from active duty in April 1946, and that this condition developed and flared up thereafter. They both testified that it was the nature of osteomyelitis to be quiescent for substantial periods of time, and that recurrence in the plaintiff’s arm was possible even though more than five years had transpired after the operation in 1952. Dr. Rosendale testified that with no recurrence in such a period of time, the probability was that plaintiff no longer had chronic osteomyelitis. Dr. Gustafson stated that the likelihood was against recurrence. All three doctors conceded that the development and use of antibiotics and modern techniques of treatment had substantially reduced the incidence of recurrence of osteomye-litis in patients.
Regarding the disability other than osteomyelitis, Dr. Thorson testified that there was bound to be permanent disability as to the function and motions of plaintiff’s left arm as a result of damage to tissues, ligaments, and tendons caused by the penetration of the shell fragment. He ascribed the pain in plaintiff’s left arm and shoulder to distortion of the anatomy and damage to nerves. Dr. Thor-son testified that there was some weakness of the deltoid muscle over the top of plaintiff’s left shoulder, and also the pectoralis major, due to lack of use and nerve damage. He had made no tests to determine the extent of any nerve or muscle damage or impairment, except that he had visually observed the atrophy of the muscles and the limitation of function as to elevation, rotation, and abduction of the left arm. Dr. Thorson declined to give an opinion as to the extent of permanent disability of the plaintiff because he had not treated or examined the plaintiff since August 1946.
Dr. Rosendale testified that he observed the atrophy of the muscles in plaintiff’s left arm and shoulder when he *484 treated him in 1950 and 1951, and stated bis opinion that it was a permanent condition. He did not attempt to evaluate tlie extent of atrophy or loss of function of the muscles involved. He did not treat or examine plaintiff after October 16, 1951.
Dr. Gustafson examined plaintiff’s arm and shoulder on August 4, 1958, and stated that there was about three-eighths to one-half inch difference in the girth of the left arm, as compared to the right, and that there was some atrophy of the deltoid and biceps muscles of the left arm and shoulder. He had not attempted to measure the extent of loss of function or evaluate the degree of disability, but visually observed some weakness in abduction and extension of the left arm. He stated that there was full range of motion of the left shoulder and that there was no pain in the muscle region through extension or flexion of the left arm.
30. It is found from all of the evidence in this case that plaintiff was not permanently incapacitated for military service as of the date of his release from active duty on account of the condition of osteomyelitis which resulted from the service-incurred injury to his left arm.
It is found, however, that the evidence is clear and convincing that plaintiff suffered atrophy to the left deltoid and pectoralis muscles of his left arm and shoulder, resulting from service-connected injury, which permanently incapacitated him for general military duty as of the date of his release from active duty on April 22, 1946. It is found that the findings and conclusions of the Correction Board to the contrary are arbitrary and unreasonable.
CONCLUSION OK LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover, and judgment will be entered to that effect with the amount of recovery to be determined pursuant to Rule 38(c).
In accordance with the opinion of the court and on a memorandum report of the commissioner as to the amount due *485 thereunder, it was ordered on February 5, 1980, that judgment for the plaintiff be entered for $18,277.10.