Per Curiam :
This is a claim for disability retirement pay by an Army reserve officer who was released from active duty, not for physical disability, on February 27, 1948. Prior to his release, a Disposition Board found that plaintiff was not incapacitated for military duty, but he did not have or request a Retiring Board at that time. However, shortly after his release, he did request (on March 9, 1948) that he be recalled to active duty for appearance before a Retiring Board. This request was rejected on April 2,1948. In June 1948, he again requested a Retiring Board; this application was turned down on July 8,1948.[1] Six years later, on July 9, 1954, plaintiff applied to the Army Board for Correction of Military Records to grant him disability retirement pay; this request was denied on December 17,1954, without a hearing. But a second request to the Correction Board, some four years later (on November 5, 1958), did lead to a hearing. After this hearing, the Correction Board determined, in 1959, that plaintiff’s separation in 1948, not by reason of physical disability, was neither erroneous nor unjust. The present action was then begun on October 9, 1959.
The case has been tried and the Trial Commissioner has reported his recommended findings, but we do not reach the merits because the suit was barred at its inception by the statute of limitations.[2] Plaintiff’s claim accrued no later than the spring of 1948 when his requests for a Retiring Board were denied. Those rejections were final, and accordingly the limitations period began to run in 1948. Under *237 our decisions in Lipp v. United States, 157 Ct. Cl. 197, 301 F. 2d 674 (1962), cert. denied, 373 U.S. 932 (1963), and Friedman v. United States, 159 Ct. Cl. 1,310 F. 2d 381 (1962), cert. denied, 373 U.S. 932 (1963), the claim was barred long before suit was instituted in 1959. See also Braun v. United States, 163 Ct. Cl. 84 (1963); Merriott v. United States, decided this day, post, p. 261.
We cannot accept plaintiff’s argument that no “final” decision, within the meaning of the Friedman opinion, was obtained until the Correction Board determination in 1959. The final refusal to grant plaintiff a Retiring Board was not “reopened” or deprived of finality by any of the events or circumstances to which plaintiff directs our attention. First, it is plain that the holding of a full-scale hearing by the Correction Board was not a species of the “reopening” contemplated by the Friedmam, opinion. Such a hearing had been held in Lipp which Friedman fully approved and confirmed.[3] The “reopening” to which Friedman refers (see p. 16, 310 F. 2d at 391) is of the kind which was present in Capps v. United States, 133 Ct. Cl. 811, 137 F. Supp. 721 (1956) and Schiffman v. United States, 162 Ct. Cl. 646, 319 F. 2d 886 (1963) — where the service itself moved to accord the plaintiff a new hearing on the basis of a new regulation or interpretation of the law. Second, the mere presentation of new evidence to a reviewing board does not constitute such a “reopening” where the board does not accept that new evidence as sufficient to overturn the adverse decision of the prior board. Third, it is immaterial in this case that it may not have been until February 1959 that the Surgeon General’s Office recognized or conceded that plaintiff had incurred an amoebic infection — the disabling condition on which he relies — while serving on active duty in China. As already indicated, the lack-of-finality and the “reopening” to which the court referred in Friedman is not an intermediate change by the service in its view of some of the facts which leads to no change in result, but rather a change in its view of the law which leads the service itself to reopen the matter and grant *238 the officer some remedy or relief previously withheld from him. All that happened in plaintiff’s case is that, when he himself applied for the second time to the Correction Board, he persuaded the Board that there was sufficient reason to grant him a hearing (as did the plaintiff-officer in Lipp).[4]
The petition is dismissed on the ground that the claim is barred by limitations. Judgment is entered to that effect.
FINDINGS OF FACT
For the limited purposes of its decision herein,[5] the court accepts the report of Trial Commissioner Richard Arens without review, and on the basis of this report makes findings of fact as follows:
1. Plaintiff, who was born on May 22, 1895, was inducted into the National Army of the United States as a private on September 21, 1917, and served on active duty from that date until he was honorably discharged as a sergeant first class on January 24, 1919. He was appointed a second lieutenant, finance section, Officers’ Reserve Corps, on October 11, 1923. He was ordered to extended active duty in the grade of captain, Officers’ Reserve Corps, on November 15, 1941. Shortly thereafter he was given a physical examination by the Army and found physically qualified for active duty. He was relieved from such active duty, not for physical disability, on February 27, 1948, while serving in the grade of colonel, Army of the United States.
2. In this suit plaintiff seeks disability retirement pay from February 27, 1948, the date on which he was relieved from active duty. The amount of recovery, if any, is reserved under rule 38(c).
3. In November 1943, at the age of 48, plaintiff was administered treatments at an army station hospital where his condition was diagnosed as pruritis ani. The hospital record contains the following notation: “Patient states he has had a pruritis ani off and on for the past two years. *239 Has been aggravated for tbe past two months. States he has had four x-ray treatments four years ago.” The daily record of therapy reveals the notation “marked improvement” after the final treatment on November 30,1943.
4. Beginning in May 1945, at the age of 50, plaintiff was afflicted with chronic sinusitis and with dermatitis, as a result of which a Disposition Board in September 1945 assigned him to duty in a temporary limited service status while he was treated on an out-patient basis. In December 1945 plaintiff was reexamined and reclassified to full military duty.
5. On July 11, 1947, plaintiff was assigned to the Finance Service, Combined Services Division, Army Advisory Group, China, where he performed the duties of Assistant Advisor. In this capacity he assisted in the preparation of budgetary and finance plans for the Chinese Armed Forces.
6. The following are extracts from the proceedings dated October 6, 1947, of a final board of medical officers which examined plaintiff at the station hospital, Army Advisory Group, Nanking, China:
PERTINENT MEDICAL HISTORY
Patient was admitted to this hospital 24 Sept. 47 because of generalized abdominal cramps, nausea and vomiting, malaise, chills, and fever of four days duration. He also complained of vague pains in both costo-vertebral angles, and had mild nocturia with some burning on urination. Headache and dizziness were also present. There was no diarrhea except that patient was having two to three loose movements a day. Anorexia and weakness were prominent.
In November 1946 the patient was hospitalized for a month for infectious hepatitis. He had definite jaundice. Records of this hospitalization were unobtainable. Since this illness patient had not been himself and had noted chiefly a lack of pep. Shortly after discharge from the hospital he had an attack of dysentery, cause unknown, and was placed in quarters. In August 1947, he again had an attack of diarrhea and was treated with sulfaguanidine in quarters. At no time were there any intestinal parasites found. There had been weight loss of about twelve pounds in the past nine months.
*240 LABORATORY AND X-RAY FINDINGS
On admission, CBC was normal, as was urinalysis. Urine urobilinogen was positive at 1 to 20 dilution but negative at 1 to 50. Feces were negative for parasites, and no blood, pus, or mucus were noted. Subsequent urinalyses for bile and urobilinogen were negative. One stool specimen was reported as containing “flagellates of trichomonas hominis”, and another showed trace of “occult Blood”. On 6 Oct 47 feces were reported negative for bile and urobilinogen.
Blood chemistry done in another hospital (Shanghai) showed a cholesterol level of 282 mg% ; total protein of 5.6 mg% with albumen 4.1 and globulin 1.5 Icteric index was unsatisf actory and was not reported.
A.G.I. series done 29 Sept 47 revealed “The duodenal bulb and the first part of the duodenum showing some deformity of mucosal pattern, but no spasm or tenderness”. The 24 hour film showed the ascending, transverse, and descending colon fairly well filled and no lesions seen.
COURSE IN HOSPITAL
Patient was placed on bed rest and given supportive therapy aimed at protecting the liver. With this regime the patient felt much better, and regained his appetite. He also gained a few pounds. However, he continued to complain of weakness, dizziness, on activity, and mild abdominal discomfort. He noticed that his hair was beginning to turn slightly yellow although his skin was normal in color. The liver continued to be palpably enlarged and tender.
It was felt that the patient had definite liver disease, non-amebic, probably early cirrhosis. Such an impression was held likely in the light of the previous infection and patient’s fairly high intake of alcohol.
DIAGNOSIS
Hepatitis, infectious, chronic, with acute exacerbation.
LINE OF DUTY-YeS.
The Board finds that this patient is disqualified for duty in the China Theater and recommends that he be returned to a General Plospital in zone of interior by water for further observation and final disposition.
This patient may travel as ambulatory case without attendant.
7. Plaintiff’s military efficiency report, dated October 18, 1947, and rendered for the period from July 11, 1947 to *241 October 13, 1947, contains tbe remark of the rating officer that plaintiff “has been sick with a serious disease, but has kept working until forced to hospital.” The report also contains the remark of the endorsing officer that plaintiff “Is believed not physically qualified for further active duty.”
8. On November 19,1947, plaintiff was admitted to Letterman General Hospital, San Francisco, California, for observation, treatment and disposition. A case summary of plaintiff’s medical records prepared by an examiner for the Army Board for Correction of Military Records reads in part as follows:
An entry in the hospital record, dated 10 Dec 47, shows that amoebic compliment fixation test was reported as 1 plus. As a result of the test an acute infection was considered unlikely and the examination was to be continued.
A note by the Ward Officer, dated 17 Dec 47, states that laboratory work had been essentially normal except for the questionably significant 1 plus compliment fixation test for amebae. Numerous fixation tests were normal. Stool exams and cultures were negative. The Ward Doctor stated that the evidence for definite organic disease is tenuous. “We are by no means sure that he had hepatitis 2 mos ago. Some of the symptoms now are certainly functional- — perhaps the whole syndrome is psychogenic. The only other good possibility is the vague prolonged possible hepatitis asthenia we sometimes see. As in other cases of this type the differentiation between chronic mild hepatitis and psychogenic asthenia is difficult to make with certainty in the military situation. An NP evaluation would be appreciated. Then he should probably be returned to duty.”
On 7 Jan 48 an NP consultant stated that the appl had a typical post-hepatitic syndrome, and its span was not considered to be prolonged beyond the usual run How much of it is functional has never been adequately determined. The treatment is merely reassurance and the prognosis is excellent, to the point of recovery. Duties should be commensurate with disability but gradually increasing hi scope.
An X-ray report, dated 8 Jan 48, stated that the cervical spine was normal. There was a mild scoliosis of the lower thoracic spine with convexity toward the left. Bone or joint pathology was not demonstrated in the thoracic spine, otherwise. ,
*242 On 14 Jan 48 the appl complained of pain in the cervical region, radiating into the scalp, especially on any motion of the neck. On the same date he was referred to the Physical Medicine Department for consultation because of a possible cervical disc. Appl received 14 treatments consisting of heat and massage to the cervical region between 14-29 J an 48.
Neurological examination, dated 20 Jan 48, stated in part that the appl undoubtedly had a number of somatic complaints which were on a functional basis. * * *
.9. On January 29,1948, a Disposition Board at Letterman General Hospital, consisting of three Medical Corps officers, after consideration of clinical records, laboratory findings and physical examination of plaintiff, diagnosed his condition as follows:
Hepatitis, acute, infectious, moderate, cause undetermined; cured. 680-100 LD, Yes.
The Disposition Board also found that plaintiff was not incapacitated for military duty; that he had received the maximum hospital benefit; that the degree of plaintiff’s disability for military service was none; that plaintiff be recommended for general service; and that plaintiff was qualified for overseas duty. The Board was required to “state disability briefly in nontechnical language,” and in response thereto, stated “Not Disabled.” The Board recommended that plaintiff “formerly classified as qualified for full military duty, be returned to full military duty.” The Disposition Board Proceedings were approved by the Commanding Officer of Letterman General Hospital on February 2, 1948.
10. Under date of February 3, 1948, Letterman General Hospital transmitted plaintiff’s Disposition Board Proceedings to the Adjutant General, Department of the Army, Washington, D.C., with a notation “Assignment requested.” By letter, dated February 4, 1948, Letterman General Hospital transmitted plaintiff’s medical records to the Adjutant General. The letter contained the following notation: “Disposition: Officer to be returned to duty upon receipt of assignment from your headquarters.” By memorandum, dated February 11, 1948, the Chief of the Military Personnel Division of the Office of the Chief of Finance of the Department of the Army advised the Adjutant General that *243 under the provisions of section II, War Department Circular No. 72, dated March 19, 1947, the plaintiff “is surplus to the needs of this command”; that “a surplus exists in the command jurisdiction of officers of the particular grade or any higher grade who are qualified to fill this duty assignment”; that plaintiff “is entitled to separation under honorable conditions,” and that it “is requested that separation be effective at the earliest practicable date after 18 February 1948.”
11. A case summary of plaintiff’s medical records prepared by an examiner for the Army Board for Correction of Military Records reads in part as follows:
Appl returned from leave to LGH on 12 Feb 48 complaining of aching in the cervical and lumbar regions, fatigue, nervousness, depression, nausea, occasional vomiting, lack of appetite and abdominal discomfort. The symptoms were constant during his sick leave and he turned into the hospital. Medical entries show he received a spinal tap on 16 Feb 48 and a notation, dated 19 Feb 48 stated there had been astounding improvement in the appl’s complaints since the spinal tap and except for a mild headache was ready to go to duty. Appl believed he would be ready for discharge from the hospital on the following day.
12. On February 25, 1948, plaintiff was given a terminal physical examination at Letterman General Hospital and found fit for general service, with no corrective measures or other action recommended.
13. On February 27,1948, plaintiff was released from further observation and treatment and was relieved from active duty not by reason of physical disability. He was ordered to revert to inactive status, with his appointment as an officer in the Army of the United States to continue for the duration of the then emergency plus 6 months, unless terminated sooner by direction of the President.
14. After his release from further observation and treatment at Letterman General Hospital and his relief from active duty, plaintiff started driving by automobile to his home in Michigan. After the first hour he was unable to drive and had to lie down on the seat and rest. He had ringing in 'his ears and pain in his leg.
15. After his arrival at his home in Michigan, plaintiff felt “worse and worse.” He lost his sense of equilibrium *244 and was “staggering all over.” A few days later, plaintiff wrote to the War Department requesting readmission to an army hospital but was told by responding letter that his records did not justify his readmission.
16. By letter, dated March 9, 1948, plaintiff requested the War Department to recall him to active duty for appearance before an army retiring board. A responding letter, dated April 2, 1948, from the Adjutant General, advised plaintiff that his entire record, including his letter and the proceedings of the Disposition Board which met at Letterman General Hospital, had been carefully reviewed; that the evidence considered did not indicate the existence of a physical defect which was permanently incapacitating for active (general) military service at the time of plaintiff’s relief from active duty; that under the circumstances, plaintiff’s appearance before an army retiring board was not warranted and his request could not therefore be favorably considered; but that if plaintiff desired further consideration to be given to his request he might submit to the Adjutant General’s office for review any information he might have which would tend to show that he had, at the time of his separation, a permanently incapacitating disability.
17. On April 1,1948, plaintiff was examined by Dr. George G. Shoemaker of Pittsburgh, Pennsylvania. Under date of June 80,1948, Dr. Shoemaker wrote to the Veterans’ Administration as follows:
This is to certify that Herbert O. Eobinson was attended by me April 1, 1948, and found to be suffering from recurrent infectious hepatitis, dysentry (amebic), and osteo-arthritis of the spine. He had a temperature of 101, pulse 90, and his physical condition was such that I had him admitted to the Veterans Hospital at Aspin-wall the same day. He was in the hospital from April 1 to June 4,1948.
I examined him again on June 17,1948. At that time his Blood Pressure was 152/88, temperature 991/2, liver was still tender on palpation, less jaundice, still pain in cervical region.
In my opinion he will require hospitalization from time to time, and his physical condition is such that he will never be able to resume his full physical activities. It is also my opinion that this physical disability is service connected.
*245 18. From April 1, 1948 until June 4, 1948, plaintiff was hospitalized at the Veterans’ Administration Hospital at Aspinwall, Pennsylvania. The hospital records reveal that upon admission plaintiff had “a multitude of complaints including wide-spread joint pains, ‘pressure dizziness in the head’, cramps and pains in the stomach and in the liver, and dysentery.” The Discharge Summary, dated June 3, 1948, reads in part as follows:
* * * Stools positive for motile trophozoites and cysts resembling E. histolytica. * * *
(6) All Hospital Diagnoses:
1. Amebiasis with amebic hepatitis.
2. Arteriosclerosis, general.
3. Anxiety state, moderately severe, manifested by numerous somatic complaints. External precipitating stress: unknown. Predisposition: minimal. Estimated resultant incapacity: moderate.
4. Degenerative joint disease (hypertrophic arthritis of spine, minimal).
5. Pruritis, ani, secondary to amebic dysentery.
6. Duodenal ulcer (inactive).
No E.N.T. pathology found.
jfc % # % $
(8) Course:
Shortly after admission to the hospital the stools were found to be positive for trophozoites and cysts of E. histolytica, and appropriate therapy was instituted. Patient’s abdominal symptoms improved somewhat; however, there was a recurrence of diarrhea and a second course of diodoquin was given. Throughout hospitalization patient has presented a picture of abject misery out of all proportion to the physical findings. One of the Consultants is of the opinion that the patient has suffered a minor cerebral vascular accident, but this examiner finds insufficient evidence for such a diagnosis. Special E.N.T. examination revealed no evidence of sinusitis of which the patient complained bitterly. X-ray studies of the spine revealed only minimal hypertrophic changes. This patient has received the maximum benefit of hospitalization and it is felt that further hospitalization at this time would be more detrimental than helpful because of the strong functional overlay.
*246 (9) Medical Prognosis and Industrial Adaptability: Prognosis good. Industrial adaptability poor because of the existing anxiety state.
(10) Disposition:
Discharge — MEA—June 4,1948.
(11) Recommendations:
Rone.
19. By letter, dated June 5,1948, plaintiff again requested an appearance before an army retiring board. A responding letter, dated July 8, 1948, from the Adjutant General, advised plaintiff that his entire record, including the medical report of his hospitalization at the Veterans’ Administration Hospital, Aspinwall, Pennsylvania, had again been carefully reviewed by medical authorities in the Department; that the evidence considered did not indicate that the physical defects in question were permanently incapacitating for active military service at the time of plaintiff’s relief from active duty; and that the prior determination that plaintiff’s appearance before an army retiring board was not warranted was reaffirmed.
20. Shortly after his discharge on June 4, 1948, from the Veterans’ Administration Hospital at Aspinwall, Pennsylvania, plaintiff resumed the office employment which he had prior to the commencement of his active military service (November 15, 1941), and continued with this employment until June 1949 when he was released because he “was sick so much.”
21. From July 20, 1948 to March 12, 1949, plaintiff received treatments on an out-patient basis by Veterans’ Administration doctors. These treatments were summarized by the Veterans’ Administration as follows:
7- 20-48 Abdominal cramps, diarrhea, much bloating and belching. Pain in joints of hands and neck. Color rather pale T99 BP 115/80 PR 80 Abdomen rather full, some tenderness over colon. Sedative. RX for Carbarsome
8- 8-48 Same as above
9- 25-48 Several spells of diarrhea, with gnawing empty feeling epigastrium, much cough at night T 983 BP 110/70 very tender in *247 R.U.Q. of abdomen Cerium oxalate Sedative. Tonic
10-16-48 Slight diarrhea once. Tenderness in_ abdomen, most of time. Gnawing in epigas-trium in P.M. T98 BP 130/90._ Some tenderness in abdomen. Acneal lesions on face. Sedative Tonics.
12-17-48 Less distress in upper abdomen Diarrhea on two occasions. Pain in shoulders. Some headache. T98 BP 120/70 Pain and stiffness of shoulders especially on right. Sedatives Analgesics
1 — 15—49 Diarrhea, several times. Stools contain white bodies. Much pain in shoulders. Much bloating. Less gnawing in epgas-trium. T98 Blood pressure 115/60. Much tenderness over subdeltoid and subacromial bursa. Phenobarbital. 0.1 gm at night acetylsal. ac 0.3 gm tid.
3-12-49 Had had an acute sinusitis treated by Dr. Wiest. Severe diarrhea last night. Some pyrosis — uses soda with relief. Some pain in left shoulder. T98 BP 120/70 Throat reddened. Periarticular swelling right wrist and metacarpophalargeal joints of index and middle fingers. Pain and limitation of motion of both shoulders. Sedatives analgesics antacids
22. By letter, dated March 14,1949, the Adjutant General, in reply to a letter from plaintiff’s wife, wrote in pertinent part as follows:
Colonel Robinson’s entire record, including Department of the Army records, and your letter with inclosures, has again been carefully reviewed in the Department. From the evidence considered your husband’s defects at the time of his separation from the service were not of sufficient severity to justify his appearance before an Army retiring board. From the recent evidence, it would appear that there has been some progression in the degree of his arthritic defect and a recurrence of his parasitic infestation since separation. However, such progression and such recurrence occurred after his reversion to an inactive status and, therefore, under the circumstances, appearance before an Army retiring board is not warranted and Colonel Robinson’s request must again be denied.
*248 The fact that Colonel Robinson is entitled to compensation on a percentage basis under the general pension laws as administered by the Veterans Administration does not in any way alter the action taken by the Department of the Army. The legislation administered by the Veterans Administration provides that an individual who has a disability which is Service connected may receive compensation even though such disability is not permanent in nature or of sufficient degree to incapacitate him for general military service and without regard to any previous finding, to include line of duty made by the Department of the Army.
23. In June of 1949 the Veterans’ Administration ordered plaintiff into the naval hospital in Philadelphia where he was hospitalized for observation and treatment for about 3 weeks to a month. The evidence does not contain any hospital record of either the diagnosis or the treatment.
24. Shortly after his release from the naval hospital in Philadelphia, plaintiff bought a small chicken farm in southern Maryland, which he personally operated, with the assistance of a helper to do the heavy work, until September 1951 when he sold the farm because the work was too strenuous for him. In the meantime plaintiff received Veterans’ Administration out-patient treatment but the evidence does not disclose either the diagnosis or the treatment administered.
25. On October 8, 1951, plaintiff was admitted to the Veterans’ Administration Hospital, Martinsburg, West Virginia, complaining of a hernia of 9 months’ duration. The clinical record shows that the routine laboratory studies were within normal limits and that repeated stool examinations for ova and parasites were negative. The clinical record further reads in part as follows:
On 10/24/51 the left inguinal hernia was repaired, and the left spermatocele exercised. Patient had a smooth postoperative course and his incisions healed * * *. At the present time he is up and about, taking a regular diet and has no complaints. He is accordingly discharged from the hospital MHB on 11/2/51.
diagnosis: (1) left, indirect, inguinal hernia
(2) SPERMATOCELE, LEFT
(3) PEPTIC ULCER
(4) AMOEBIASIS, SC
(5) ATROPHY OE RIGHT TESTICLE
*249 26. On July 3, 1953, plaintiff signed a certificate in connection with reserve training duty, which, reads in pertinent part as follows (underscoring in plaintiff’s handwriting) :
I now consider myself sound and well and physically qualified for full military duty. I was considered physically qualified for military service at the time of accomplishment of my last physical examination on or about Sept. 1952 at Baltimore, Md. To the best of my (Date) _ (Place) knowledge and belief, I have no physical defects or conditions, except as noted below, which would preclude the performance of full military duty.
No physical defects or conditions were noted by plaintiff on the certificate. Plaintiff testified to the effect that he executed the certificate on the assurance from his unit commander that the active duty would consist of attendance at courses of instruction and would not involve heavy physical duty. Plaintiff did serve on such active duty from July 4, 1953 to July 18,1953.
l27. In November 1953 plaintiff obtained employment in a retail shoe store but after 2 months was let go because of his physical and mental condition. Plaintiff fatigued easily and had difficulty remembering the location, style and number of the merchandise.
28. Beginning on July 6, 1954, and continuing until the date of his retirement from Government service on September 30, 1960, plaintiff was employed as a civilian employee by the Department of the Air Force. In the course of this employment plaintiff held the position titles of accountant, contract assistant, contract specialist, and finally, at the time of his retirement, property disposal officer, grade GS-9, at an annual salary of $7,425. Plaintiff’s sick leave record for the calendar year 1960 discloses that plaintiff took 43 hours of sick leave up to the date of his retirement.
29. By letter, dated July 9, 1954, the Discharge Review Counsel of the American Red Cross transmitted to the Army Board for Correction of Military Records an application dated June 17,1954, signed by plaintiff, wherein plaintiff requested the following correction of error or injustice: “The finding that I was qualified for active service was in error and had I remained in the service for an additional thirty *250 days I would have had to again been hospitalized.” By letter, dated December 17, 1954, the Adjutant General advised plaintiff that a thorough review of his records failed to disclose material evidence of error or injustice regarding his separation from active service, not by reason of physical disability on February 27, 1948; and that in the absence of additional material evidence, no formal review by the Board or further action on plaintiff’s application was contemplated.
30. On May 31,1955, plaintiff was placed on the Army of the United States Retired List in the grade of colonel with entitlement to retirement pay from June 1, 1955, under the provisions of sections 301 and 302 of the Act of Congress approved June 29,1948 (PublicLaw 810, 80th Cong.), having been found, upon application, to be eligible for such retirement pay by reason of age and satisfactory military service.
31. Plaintiff was admitted to the Veterans’ Administration Hospital, Martinsburg, West Virginia, on December 27, 1956, and was discharged on January 19, 1957. His complaints included generalized abdominal cramps, mucous and bright red blood in his stools and intermittent discharge from both ears with impaired hearing. Laboratory data showed that several stool examinations were made, “particularly looking for endomoebae histolytica” and that such examinations revealed “a rare trophozooite of the endomoebae his-tolytica and an occasional cyst. This parasite in specimens 1,2, 3, 6 and 7.” After the diagnosis of amebic dysentery was established, he was placed on diodoquin in full therapeutic doses to be taken four times a day for 21 days. After the first few days of this treatment, his bowel habits returned to normal, his abdominal discomfort cleared, and his liver enlargement disappeared. The clinical record shows the diagnosis as “Amebic dysentery, treated, the process being well under control at the time of discharge.”
32. Plaintiff was again admitted to the Veterans’ Administration Hospital, Martinsburg, West Virginia, on April 8, 1957, and was discharged on April 16, 1957. The clinical record shows that plaintiff did very well after his discharge from his prior hospitalization on January 19, 1957, until about 2 weeks prior to his admission on April 8, 1957, when he began to have itching over the anus and loose bowels three *251 to four times a day with some gas in the belly and lower right quadrant pain before each defecation which disappeared after movement. Plaintiff was also noted to have ringing in both ears which was found to be high frequency deafness due to degeneration of the acoustic nerve but of unknown cause. The laboratory data showed that examinations of stools following Fleet enema revealed no amoeba evident. A further checkup of plaintiff’s stools was found to be negative for amoebae and amoebic cysts. The clinical record notes that plaintiff “was given another 21 days supply of diodoquin and his stools are to be further checked up in case any symptoms develop again in the future.” The diagnoses were shown as (1) amoebiasis, treated, improved.; (2) pruritis ani, treated, improved; (3) right inguinal hernia, untreated, unchanged; and (4) arcus senilis, untreated, unchanged.
,33. By application dated November 5, 1958, plaintiff requested the Army Board for Correction of Military Records for “Correction of my military record to show my relief from active-duty by reason of physical disability incurred in line of duty and my certification to the VA for disability retirement pay from February 28,1948, pursuant to Section 5, Act of April 3,1939, as amended 10 USCA, Section 456.” Plaintiff alleged that his record failed to reflect that on February 27, 1948, he was permanently incapacitated for active service by reason of chronic amoebiasis and hypertrophic arthritis of the cervical spine, incident to service and the result of an incident of service. A certificate, dated October 13,1958, signed by Dr. Clarence R. Hartman, was submitted to the Board by plaintiff. In the certificate Dr. Hartman stated, among other things, that having reviewed plaintiff’s medical records, it was his opinion, based upon accepted medical principles and his experience with the disease, that there was a very high probability that the amoebiasis identified between April 1,1948 and June 4,1948, at the Veterans’ Administration Hospital, Aspinwall, Pennsylvania, was a condition which originated in Nanking, China, in 1946.
34. On February 6, 1959, the Army Board for Correction of Military Records requested the Physical Standards Division of the Surgeon General’s Office to review plaintiff’s application, together with the military and medical records, *252 and to furnish a comprehensive opinion for guidance of the Board regarding the medical issues raised by plaintiff.
35. On February 11, 1959, the Assistant Chief, Physical Standards Division of the Surgeon General’s Office, advised the Army Board for Correction of Military Records as follows:
1. Records in the case of HERBERT O. ROBINSON, O 184201 have been again reviewed in this office.
2. It appears that subsequent to service the VA established a diagnosis of amebiasis in this case. In view of the medical history of repeated attacks of diarrhea and associated symptoms during his 1946-41 duty in China, it may be presumed that the infestation by E. Histoly-tica probably occurred at that time.
3. The establishment of a diagnosis of amebiasis, the presence of trophozoites or cysts in the stool, or the symptomatic clinical evidence of amebic infection are not by the mere fact of their presence, incapacitating for military service under current retention standards or those in effect in 1948. This determination is based on well-established medical principles and facts of world-wide distribution of this condition, the great variability in severity of its manifestations, the presence of trophozoites and cysts in the stools of a significant percentage of “normal” or asymptomatic persons and its amenability to appropriate treatment. Unfitness for military service as a result of this disease is determined on the basis of residuals.
4. In this instance the record fails to provide evidence of severe complications or residuals of the amebic infection which would have warranted separation for physical disability. Also, the arthritis concerned was determined to be minimal both by the service agency and the VA and not incapacitating for further military duty.
5. The opinion is expressed that the evidence of record fails to support this applicant’s contention that he should have been retired for physical disability under the rules, laws, regulation, and policies in effect in 1948.
36. Plaintiff was granted a hearing by the Board for Correction of Military Records on April 29, 1959. The Board had before it the complete official Army record of plaintiff, together with his application and a summary prepared by the Board’s Examiner. Plaintiff did not personally appear because he was then in the Veterans’ Administration Hospital in Philadelphia, but was represented by counsel. Dr. *253 Clarence E. Hartman, associate professor of medicine at George Washington University and director of the outpatient department of the George Washington University Hospital, who is a specialist in internal medicine and gastro-enterology, and who had extensive experience as chief of medical services in army hospitals, particularly in the Far East, testified at length before the Board as a witness for plaintiff. He testified in substance that he had examined the medical records of the plaintiff; that in his opinion the disease of amoebiasis which was diagnosed in plaintiff’s case at the Veterans’ Administration Hospital in April 1948 began during plaintiff’s service in China in 1946; that he felt very strongly that plaintiff had amoebiasis on February 27, 1948 (the date of his relief from active duty); that he questioned the diagnosis of hepatitis in plaintiff’s case; and that the medical record indicated that plaintiff was not fit for duty on February 27, 1948. Dr. Hartman further testified that it would be possible for other professionally qualified individuals, having before them the evidence available at the time of plaintiff’s final physical examination at Letterman General Hospital to come logically to a different medical conclusion; but that plaintiff’s subsequent course “would certainly justify an opinion that he was not fit for military duty.” Dr. Hartman estimated that plaintiff was “possibly 50 per cent” disabled at the time of his hospitalization at the Veterans’ Administration Hospital at Aspinwall, Pennsylvania (April 1,1948 to June 4,1948).
37. The Army Board for Correction of Military Eecords, after making detailed findings, made the following conclusions and recommendation:
THE BOARD CONCLUDES :
1. That insufficient evidence has been presented to establish the existence of a pathological condition or conditions of such nature or degree which would have warranted applicant’s retirement for physical disability at the time of his release from active duty.
2. That it concurs with the opinion expressed by the Surgeon General’s Office to the effect that the medical records fail to provide evidence of severe complications or residuals of amoebic infection which would have warranted applicant’s retirement for physical disability in February 1948.
*254 8. That in view of the foregoing, applicant’s separation from the service not by reason of physical disability was not in error or unjust.
TI-IE BOARD RECOMMENDS:
That in the case of Herbert o. robinson, his application for correction of his miltary records be denied.
The Board’s findings, conclusions and recommendation were approved by the Assistant Secretary of the Army for Manpower, Personnel and Reserve Forces on May 29, 1959. On June 18,1959, plaintiff was notified that his application was denied.
38. On May 27, 1959, plaintiff was admitted to the U.S. Naval Hospital, Philadelphia, Pennsylvania, complaining of pruritis ani and occasional low chest pain which was dull in character. The clinical record discloses that there had been no change in bowel habits; that the physical examination was essentially within normal limits except for a hypertrophied anal papillae which could prolapse, and an external skin tag; that the laboratory studies including a OBO, urinalysis, fasting blood sugar, BUN and liver function studies were all within normal limits; that an electrocardiogram was normal; and that a chest X-ray and barium enema study was normal. On June 5, 1959 the hypertrophied anal papilla was excised and a hemorrhoidectomy was performed. The postoperative course was uneventful. Plaintiff was “discharged to home, maximum hospital benefits” on June 12, 1959. The final diagnosis was: Hemorrhoid external.
39. A rating decision of the Veterans’ Administration, dated November 5, 1959, on a claim for disability compensation filed by plaintiff, reads in pertinent part as follows:
1. SC INC WW II, 3 8 USC 310
30% from 2-28-48 to 12-21-59
10% from 12-22-59
amebiasis with amebic hepatitis and PRURITIS ANI 7321,7323
10% from 2-28-48
arthritis, hypertrophic, spine minimal 10% from 2-28-48 to 7-5-50 5003
20% from 7-6-50
arteriosclerosis, generalized 10% from 2-28-48 7100
*255 9105 ANXIETY REACTION
0% from 2-28-48
6510 SINUSITIS, DERMATITIS, DEFECTIVE HEARING 8. NSC, WW H, WW I ATROPHY, RT TESTIS, SCAR APPENDECTOMY SYSTOLIC MURMUR, MILD FUNCTIONAL; ULCER, duodenal; CHEST NODULES, PRIMARY HEALED
13. Constitutional or developmental abnormality — not a disability under the law ASTIGMATISM, HYPEROPIC, BILATERAL
comb : 50% from 6-5-48 to 7-5-50
60% from 7-6-50 to 12-21-59
40% from 12-22-59
32. No Combat
40. In addition to plaintiff, three medical witnesses, all eminently qualified, testified at the trial of the case hi this court. None of the medical witnesses had examined plaintiff, but testified exclusively on the basis of professional knowledge and study of plaintiff’s medical records. Dr. Clarence R. Hartman, who had previously testified as a witness for plaintiff before the Army Board, for Correction of Military Records (finding 36 supra), appeared as a witness for plaintiff at the trial. Dr. Harold E. Opsahl, Chief of the Physical Standards Division of the Office of the Surgeon General, and Dr. Emmett L. Kehoe, Army Medical Corps, Chief of the Gastroenterology Division, Walter Reed Army Hospital, who had special training in tropical diseases, including service in the Tropics, testified at the trial as witnesses for the clefendant.
41. Prior to October 9, 1953, there were no published retention standards of the Department of the Army for retention of officers on active duty. However, a “Manual for Officers in the Disposition and Retiring Board Branch of the Physical Standards Division of the Surgeon General’s Office” had been developed in the Office of the Surgeon General because at that time cases were finally reviewed in the Physical Standards Division of the Surgeon General’s Office. The manual set forth certain standards for retention as regards specific diseases, injuries and infirmities, and included therein the following:
*256 Tropical fevers and various parasitic infections and various protozoan infections (dysinteries) per se, will not be considered incapacitating for active service. The residuals of these infections will be the determining factors as to the officer’s incapacity.
Transfer of the officer to a tropical medical center may be indicated.
These standards later became the first published retention standards, SR40-120-1, dated 9 October 1958, entitled “Medical Standards of Fitness and Unfitness for Retention on Active Duty.”
42. The medical witnesses were in substantial agreement respecting the characteristics of amoebiasis which is an infection of the body with a microscopic parasite called the amoeba histolytica. The symptoms include diarrhea, bleeding stools, upset digestive mechanism, anxiety, loss of appetite, and fatigue. The diagnosis is usually made after finding evidence of the parasites, known as amebic cysts, in the stools. The parasites causing the disease exist throughout the world but the disease is much more prevalent in China than in the United States. About 10 percent of the people in the United States have amoebae in their stools, but only about 10 percent of this number suffer any ill effects. Amoebiasis is transmitted from individual to individual in its cystic form. The incubation period is commonly from 3 to 4 weeks but may be from 5 days to several months. Amoebiasis is a cyclic disease which exists in active and inactive states, so that one who is afflicted with the disease may have periods of a feeling of well-being, alternating with periods of feeling ill. With proper diagnosis and treatment most persons with amoebiasis are cured. In a small percentage of cases there are recurrences. If neglected the case may develop into a chronic disorder and can result in permanent damage. The residuals of amoebiasis include liver abscess, colitis, destruction of portions of the bowel wall, and in rare cases, brain damage.
43. The consensus of the medical witnesses was that although the hospital records do not reveal any laboratory evidence of amoebae in plaintiff’s stools prior to plaintiff’s hospitalization at Aspinwall Veterans’ Hospital (April 1, 1948 to June 4, 1948), the disease which was diagnosed as *257 amoebiasis at Aspinwall Veterans’ Hospital was contracted by plaintiff in China in 1947 although perhaps in the interim it was at times in an inactive or dormant state.
44. Dr. Hartman repeated at the trial the substance of the testimony which he had previously given before the Board for Correction of Military Eecords (finding 36 supra). He emphasized his opinion that plaintiff was suffering from acute amoebic dysentery with liver involvement in China in 1946; and that on the basis of plaintiff’s clinical record subsequent to his release from Letterman General Hospital, plaintiff was permanently unfit for military service by reason of amoebiasis on February 27, 1948, the date of plaintiff’s release from Letterman General Hospital and from active duty. Dr. Hartman further testified that he was not acquainted with the Army physical retention standards in effect in 1948; that he could not have decided at the time of plaintiff’s release from active duty whether or not he was then permanently unfit for military duty and could have decided only on the basis of plaintiff’s subsequent clinical course. Dr. Hartman also testified that if he had been chief of medical service with a patient under his care who had the symptoms and the diagnosis that plaintiff had at Aspinwall Veterans’ Hospital in 1948, he would not have referred the patient to a Medical Board, Disposition Board for retirement, but “would have given him a trial on duty, but with my fingers crossed”; and would have required the patient to return at intervals for examinations.
45. Dr. Opsahl testified in essence that plaintiff was infected with amoeba histolytica in China, but was much improved though not cured by the treatments administered at Letterman General Hospital prior to the time of his release from active duty; and that the record failed to provide evidence of severe complications or residuals of the amebic infection which would have warranted separation for physical disability. Dr. Opsahl further testified that some of plaintiff’s symptoms were of the degenerative type that develop as a part of the aging process and that plaintiff’s arthritis was only minimal and not incapacitating for military service.
46. Dr. Kehoe testified that he had never known anyone in his nearly 28 years of service to be retired for amoebiasis. *258 He further testified, “I have had many patients who, during the war in India have had amebic infections that were treated for amebiasis; maybe once or twice a year they will have a flair up of diarrhea with cramping, maybe three or four times a year. Most often, you can’t find the amoeba in their stools. You cannot say that the amoeba, [was] the cause of these residual symptoms. Most of them respond to sort of non-specific therapy with bismuth, paregoric, dieting and so on. So far as I know, most of them do duty except for those periods when they have intense diarrhea which is not frequent. But it is not too uncommon for patients to give that sort of history.” Hr. Kehoe also testified that, based on well-established medical principles, he saw no evidence that plaintiff was permanently incapacitated for general military service on February 27,1948, the date of plaintiff’s release to inactive duty; but that plaintiff was fit for duty; that there was no evidence in any of the X-rays showing any malignancy or any other changes; and that he did not discover any evidence of severe complications or residuals of amebic infection. Hr. Kehoe stated:
The records from Letterman Hospital in 1948 did not indicate that the Plaintiff had any disease which would qualify him for retirement.
Later records indicated that amoeba were found about a month and a half later at the Veterans Hospital. While [Why] they weren’t found at Letterman, I have no idea. Had they been found, I am sure he would have been treated for his disease. If he were treated for his disease, I would expect that he would have improved sufficiently to be returned to duty.
CONCLUSION OE LAW
Upon the material portion of the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover and his petition is dismissed.

 Another request for an appearance before a Retiring Board was turned down In March 1949.

 Because of this conclusion, we have considered neither the correctness of the commissioner’s findings on the merits nor the plaintiff’s extensive exceptions to those findings.

 A fortiori, the denial of a hearing by the Correction Board is not a “reopening.” In almost all of the disability retirement eases brought in this court there has been some action by the Correction Board, either a denial of a hearing or the holding of a hearing.

 Plaintiff also cites Allin v. United States, 147 Ct. Cl. 459 (1959), but that decision is inapposite. Tbe court there found on the basis of that particular record that until the Correction Board acted “the plaintiff’s case dragged along with numerous examinations, tentative determinations and postponements” (id. at 465). There was no prior final determination.

 See footnote 2, supra.